<table>
<tr><td>

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**DAVIDOFF HUTCHER & CITRON LLP**
605 Third Avenue
New York, New York 10158
Telephone: (646) 428-3235
Andreas Koutsoudakis, Esq. (aak@dhclegal.com)
Robert L. Rattet (rlr@dhclegal.com)
(Admitted Pro Hac Vice)

*Proposed Counsel for the Debtor and Debtor-in Possession*

</td><td>

*Hearing Date:*
*July 7, 2026 @ 10:00 A.M.*

</td></tr>
<tr><td>

In re:

    BRASS WORKS URBAN RENEWAL
    COMPANY, LLC,

                 Debtor.

</td><td>

Chapter 11

Case No. 26-15809 (MEH)

</td></tr>
</table>

**OBJECTION TO THE MOTION OF CREDITOR ASVRF PATERSON PLANK RD J-C,
LLC AND PARTY IN INTEREST PATERSON PLANK RD J-C, LLC FOR ENTRY OF
AN ORDER (I) DISMISSING THE CHAPTER 11 CASE PURSUANT TO 11 U.S.C.
§ 1112(b), OR, IN THE ALTERNATIVE, (II) GRANTING RELIEF FROM THE
<u>AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)(1)</u>**

**TO:   THE HONORABLE MARK E. HALL,
       UNITED STATES BANKRUPTCY JUDGE:**

Brass Works Urban Renewal Company, LLC, the above-captioned debtor and debtor-in-

possession (the "Debtor"), by its undersigned attorneys, Davidoff Hutcher & Citron LLP,

respectfully submits this Objection (this "Objection") to the Motion of Creditor ASVRF Paterson

Plank Rd J-C, LLC ("ASVRF") and party in interest Paterson Plank RD J-C, LLC ("the "LLC",

and together with ASVRF, where appropriate, the "Movants"), seeking entry of an order

dismissing the Debtor's Chapter 11 case pursuant to 11 U.S.C. § 1112(b), or alternatively, to lift

the automatic stay (the "Motion") [ECF Docket No. 19], and in support thereof, avers as follows:

## SUMMARY OF THE OBJECTION

Movants spill a lot of ink reiterating the obvious – that there was a monetary default by the Debtor under a prepetition executory contract, the LLC Agreement, under which the Debtor's substantial and valuable membership interests are the principal asset of its bankrupt estate[1]. This fact is undisputed and has been memorialized by the Delaware Court of Chancery (the "State Court") in its Memorandum Opinion of November 21, 2025 (the "Memorandum Opinion"). However, Movants have failed to disclose to either the Debtor or this Court *if the monetary default may have since been cured from the existing rents from the Property*. The Debtor is unable to ascertain the amount of actual pre-petition monetary default, as ASVRF has continued to breach its fiduciary duties to the Debtor by failing to contemporaneously provide monthly managements reports for the Property since providing the March 2026 report.

The last management report provided to the Debtor - for March 2026  - further reveals that the Property is now approximately 95% rented, a sharp increase from prior occupancy figures, further increasing the value of the Debtor's interests in the LLC.

On April 29, 2025, AVSRF scheduled a UCC foreclosure sale with a defective notice not in compliance with NJ UCC 9-611, as the notice fails to comply with UCC  9-611 in terms of specifying any monetary or other default or providing the right of redemption. The notice is therefore void *ab initio*, giving further cause for denial of any stay relief. Moreover, the attempt to foreclose on the Debtor's membership interests in the LLC, together with receiving offers to purchase the Property without providing such disclosures to the Debtor, may constitute a breach of fiduciary duty to the Debtor as part of an ongoing scheme to cause the forfeiture or cram down

---

[1]   The Limited Liability Company Agreement of Paterson Plank RD J-C, LLC (the "LLC"), as amended by a First Amendment to Limited Liability Company Agreement dated as of January 10, 2023 (collectively, the "LLC Agreement").

of the Debtor's interests in the UCC for their own gain. The Debtor therefore needs to conduct significant discovery of ASVRF, its former counsel and the current management company ("Graystone") to investigate these alleged breaches of fiduciary duty and to be provided with all current management reports and other financial information and disclosures regarding the Property that the Debtor is entitled to as the Debtor moves forward towards confirmation of its Plan.

Although the Memorandum Opinion preliminarily removed the Debtor as manager of the LLC, the LLC Agreement remains in full force and effect, has not been terminated and the Debtor therefore has valid, vital, and subsisting rights: (1) to assume and cure any monetary defaults under the LLC Agreement pursuant to 11 U.S.C. Section 365(b) and 1123(a)(5)(G) under a confirmed plan of reorganization; and (2) upon payment of the cure, if any, to be reinstated as manager of the LLC; and (3) simultaneously redeem the Class B interests of ASVRF in the LLC as permitted under the LLC Agreement.

It is usual and almost universal that when a Debtor files for relief under Title 11, that such debtor is in default under some, or all, of its executory contracts. It is exactly for this reason that section 1123(a) provides that "[**n]otwithstanding any otherwise applicable non-bankruptcy provision**" a debtor may, pursuant to a Chapter 11 plan, cure or waive any default.[2] Similarly, section 365(a) provides: "[e]xcept as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." Both sections only require that a debtor cure any defaults outstanding under the underlying agreement being assumed.

---

[2]   The preamble to 11 U.S.C. § 1123(a), entitled "Contents of Plan" states: "Notwithstanding any otherwise applicable non-bankruptcy law, a plan shall…." This exemption from non-bankruptcy law further allows a debtor to prosecute a plan, pursuant to 11 U.S.C. § 1123(a)(5)(G) that provides for the: "curing or waiving of **any** default." (emphasis supplied).

The Debtor is obtaining the financial wherewithal to cure any defaults, including curing any pre-petition monetary default which resulted in preliminarily removing the Debtor as Manager, and fund a 100% plan to all of its creditors. The Debtor has already engaged Jones Lang LaSalle ("JLL") to obtain the necessary capital and who has already prepared an offering memorandum.See Greer Declaration as Exhibit C. Importantly, upon assumption and cure, and the concomitant reinstatement as manager of the LLC, the Debtor then can, on behalf of the LLC, exercise the Right of Redemption. See Pages 27-29 of the Memorandum Opinion in conjunction with Section 12 of the LLC Agreement (Movant Exhibit B).

In their Motion, Movants also make an alternative request to lift the automatic stay. In addition to the defectiveness of the notice to foreclose Movants ignore their obligation under the Local Rules of this District to attach an appraisal to this Motion. This is no harmless procedural error. Rather by failing to attach an appraisal, Movant purposefully seeks to obfuscate both the amount of equity that the Debtor has, and the economic interest of the Debtor that would be wiped out in a foreclosure. It cannot be understated – Movants seek a monumental windfall, as there is a significant equity cushion in the Debtor's Class A Member Interests which serve as collateral for certain payment obligations to Movants under the LLC Agreement. This would be akin to forfeiture of the Debtor's economic interests which are otherwise guaranteed by Third Circuit and other applicable law. Such an attempt to wipe out assets of the Debtor's estate should not be tolerated. At bottom, dismissal or lifting of the automatic stay has only the potential to benefit Movant, while all other creditors and the estate will face a total loss.

The Debtor has already filed a confirmable plan which reinstates and cures the Debtor's defaults, if any, under the LLC Agreement and otherwise pays all creditors in full, which belies Movant's assertion that the Debtor is incapable of reorganization.

4

Moreover, the Bankruptcy Court has exclusive jurisdiction of the Debtor's adversary proceeding brought under Section 365, which action can be subsumed or consolidated with the Plan confirmation process. Adversary proceedings seeking to determine disputes with respect to an executory contract and the parties' respective claims thereunder is purely a core proceeding – accordingly, there has been no venue shopping or gerrymandering as Movants falsely allege. In fact, the Debtor is a New Jersey LLC, with the Property at issue also being located in New Jersey. This Court has exclusive jurisdiction over the Debtor's Chapter 11 case and the core issues rained and discussed herein and in the Plan.

For all of these reasons, the Debtor asserts that the Motion should be denied in all respects and the Debtor's plan should move towards the confirmation process..

**FACTUAL BACKGROUND**

The following facts are incorporated in to the accompanying Declaration of Robert M. Greer annexed hereto.

## A. **The Property**

In February 2002, Robert M. Greer invested to purchase a dilapidated warehouse in Jersey City, New Jersey with plans to rebuild that warehouse into a luxury residential building. That rebuilt building would become the Cliffs, described in the Memorandum Opinion as the "crown jewel" of the Greer family (the "Property"). The Debtor and its related entities are a family-owned and family-run business, and the Greer Family engaged in substantial efforts over several years to develop the Property from a "grimy" warehouse to an A+ residential building.

The Property was eventually put into service in 2008. When The Debtor and its principals initially developed the Property, they intended it to be a condominium, but that plan was abandoned in favor of creating a rental property amidst the financial crisis of 2008 when purchasers

were unable to secure financing to purchase the units. Since its inception, the Cliffs has been operated and managed by City Homes and Gardens, LLC ("CHG") and Robert M. Greer.

The Property has been secured by a mortgage and a note held by a senior lender since the time it was built in 2002.. At the time of the initial purchase and construction in 2002, the senior lender was Key Bank.

### B.   ASVRF's Investment in the Property

At some point in late 2020 or early 2021, Robert M. Greer approached a representative of American Realty Advisors, the parent of AVSRF, by the name of Shelly Santulli about providing additional capital to the Property. At the time, the Property was owned by the Greer Family as well as their affiliates and Aldrich, Eastman, and Walch ("AEW"). The Property also still had a mortgage with Key Bank, which was set to mature in the coming months.

### C.   The Relevant Agreements, Financing, and Inevitable Redemption

On June 29, 2021, ASVRF and The Debtor entered into the LLC Agreement. Under the LLC Agreement, The Debtor was appointed the Manager and 100% owner of the Class A Interests. ASVRF was the 100% owner of the Class B Interests. Concurrently with the LLC Agreement, Robert M. Greer and Robert F. Greer entered into an Indemnity Agreement for the benefit of ASVRF and the Company, and CHG entered into a Property Management Agreement with the Company.

Importantly, the LLC Agreement also contains a redemption right. JX008 (LLC Agreement, Art. 12, Redemption) (the "Redemption Obligation"). The parties agreed to a "Mandatory Redemption" wherein ASVRF's Class B Membership Interests would mandatorily be redeemed.

6

**D.  The Fully Disclosed Plan to Convert to Condominiums**

In early 2024, The Debtor and Mr. Greer approached ASVRF about the plan to start taking steps to convert the rentals into a condominium. By the summer of 2024, the Condo Conversion Plan had advanced beyond just initial planning. In June, July, and August 2024, Mr. Greer advised representatives of ASVRF and QuadReal about the steps The Debtor was taking to convert the Property to a condominium, including going out to existing tenants to understand their interest in purchasing condominiums at a discount.

By September 2024, the Condo Conversion Plan was at a point where state regulatory approval of certain documentation for condominium conversion would be required. In a September 23, 2024 email to ASVRF and QuadReal, Mr. Greer recounted the business plan change.

As explained below, this change to condominium conversion necessarily meant reducing the short-term cash flow of the project. On September 23, 2024, a representative of QuadReal responded to the email chain detailing the Condo Conversion Plan stating, "*This is approved.* Mr. - Please keep us updated as things evolve." (emphasis added). Mr. Greer responded and stated, "Thanks Derek, *I will keep you all updated as we start signing contracts." Id.* (emphasis added). A representative of ASVRF then responded on the same day to the same email chain and asked for a copy of the State of New Jersey approved offering plan. *Id.* Despite The Debtor repeatedly advising ASVRF about the Condo Conversion Plan, ASVRF never objected to the Condo Conversion Plan.

ASVRF appeared to be enthusiastic about the Condo Conversion Plan because ASVRF would be redeemed and paid under the LLC Agreement what it expected at the time of contracting. Despite the Debtor repeatedly advising ASVRF about the Condo Conversion Plan, ASVRF never objected to the Condo Conversion Plan.

**E.** **Debtor Stops Making Payments to ASVRF to Execute on the Agreed-Upon Condo Conversion Plan**

Because of the Condo Conversion Plan, the LLC stopped leasing out vacant rental units at the Property to ensure those units were available for sale as condominiums. This was fully disclosed to ASVRF in multiple emails from Mr. Greer to representatives of ASVRF. This would cause the cash flow from the Project to decline in the short term. In light of this fact, Mr. Greer advised ASVRF that the Company would be prioritizing paying QuadReal in full to ensure that there was no event of default under the mortgage to protect both The Debtor and ASVRF's equity and avoid a foreclosure on the Property. Indeed, payment to the senior lender, QuadReal, was essential to both parties. Mr. Greer also advised ASVRF that he would be using personal funds to pay for interest rate caps needed to protect the mortgage interest rate and to make up any shortfalls in cash flow to ensure payments to QuadReal. Indeed, in total, Mr. Greer made personal payments aggregating to over $6 million to protect the Debtor's and ASVRF's ownership and equity interests in the Property.

Nevertheless, ASVRF sent a written notice to the Debtor on August 16, 2024 purportedly advising that an Event of Default occurred as a result of The Debtor' failure to make a payment of $81,236.15. The $81,236.15 represented the return owed to ASVRF on August 1, 2024 that exceeded the LLC Agreement's Capitalized Preferred Return Accrual Cap. This was part of ASVRF's alleged purposeful design to create a forfeiture, since the value of the Debtor's economic interests are materially reduced by the stripping of management rights and the concomitant restriction on the right of redemption of the Class B interests. As of the Petition Date, the Debtor believed, although could not confirm,  that it owed Movants the approximate sum of $2,134,133.88 (the "Estimated Cure Amount").

8

**F.  ASVRF Refuses The Debtor's Attempts to Implement the Mandatory Redemption**

ASVRF thereafter served a notice terminating the Debtor as manager. To prevent being forfeited of equity with a value of approximately $60,000,000.00, on May 8, 2025, the Debtor notified ASVRF in writing that it was electing to redeem ASVRF's Class B Membership Interests pursuant to the Redemption Agreement (the "Redemption Notice"). The Debtor also attached a signed Redemption Agreement to that Redemption Notice and asked ASVRF to sign that agreement so that the Mandatory Redemption could proceed. Under the LLC Agreement, this could be done by the Debtor as manager after June 1, 2024, and prior to the Outside Date as defined in the LLC Agreement. The notice was otherwise in conformance with all other contractual requirements. On May 9, 2025, ASVRF responded to the Redemption Notice. ASVRF rejected the Mandatory Redemption, arguing, *inter alia,* that the Debtor lacked the authority to issue a notice on behalf of the Company because it is no longer Manager.

On July 2, 2025, the Debtor sent a letter to ASVRF following up its May 8, 2025 Redemption Notice, explaining why ASVRF's May 9, 2025 rejection of the Redemption Notice was improper, and asking ASVRF to provide a statement reflecting what ASVRF believed to be the appropriate calculations of payments to be made at the Redemption Closing. Later that same day, July 2, 2025, ASVRF responded, once again rejecting The Debtor' attempts to effectuate the Redemption Notice.

**G.  The Chapter 11 Filing**

On April 26, 2026, ASVRF served a Notification of Disposition of Collateral (Greer Declaration, Exhibit "B"; the "UCC Notice")) under which it announced that it was selling all right, title, and interest of the Debtor (the "UCC Sale") in:

> a)  The Debtor's Class A membership interest in Paterson Plank RD J-C, LLC, a Delaware limited liability company (the "Company");

b) all other limited liability company interests in the Company, including any economic interest, right to share in the income, gains, losses, deductions, credit, or similar items of, and to receive distributions from, the Company, any right to vote and right to receive information concerning the business and affairs of the Company; and

c) all other collateral pledged by Debtor under the Transaction Documents (as hereinafter defined).

The UCC Sale would have the effect of extinguishing the Debtor's interests in the Company, which the Debtor values its interest at approximately $64,000,000 (See valuation contained in JLL Offering Memorandum, Greer Declaration Exhibit "C").

However, upon a reading of the specific terms of the UCC Notice, it is patently clear that the notice is defective as failing to comply with the requirements of NJ UCC 9-611. 9-611 states as follows:

12A:9-611. Notification Before Disposition of Collateral.

(a) "Notification date." In this section, "notification date" means the earlier of the date on which:
(1) a secured party sends to the debtor and any secondary obligor an authenticated notification of disposition; or
(2) the debtor and any secondary obligor waive the right to notification.

(b) Notification of disposition required. Except as otherwise provided in subsection (d), a secured party that disposes of collateral under 12A:9-610 shall send to the persons specified in subsection (c) a reasonable authenticated notification of disposition.

(c) Persons to be notified. To comply with subsection (b), the secured party shall send an authenticated notification of disposition to:
(1) the debtor;
(2) any secondary obligor; and
(3) if the collateral is other than consumer goods:
(A) any other person from which the secured party has received, before the notification date, an authenticated notification of a claim of an interest in the collateral;
(B) any other secured party or lienholder that, 10 days before the notification date, held a security interest in or other lien on the

collateral perfected by the filing of a financing statement that:

(i) identified the collateral;

(ii) was indexed under the debtor's name as of that date; and

(iii) was filed in the office in which to file a financing statement against the debtor covering the collateral as of that date; and

(C) any other secured party that, 10 days before the notification date, held a security interest in the collateral perfected by compliance with a statute, regulation, or treaty described in 12A:9-311 (a).

(d) Subsection (b) inapplicable: perishable collateral; recognized market. Subsection (b) does not apply if the collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market.

(e) Compliance with subsection (c) (3) (B). A secured party complies with the requirement for notification prescribed by subsection (c) (3) (B) if:

(1) not later than 20 days or earlier than 30 days before the notification date, the secured party requests, in a commercially reasonable manner, information concerning financing statements indexed under the debtor's name in the office indicated in subsection (c) (3) (B); and

(2) before the notification date, the secured party:

(A) did not receive a response to the request for information; or

(B) received a response to the request for information and sent an authenticated notification of disposition to each secured party or other lienholder named in that response whose financing statement covered the collateral.

L.2001, c.117, s.1; amended 2001, c.386, s.100.

New Jersey's UCC 9-611 (codified as N.J.S.A. 12A:9-611) dictates that a secured creditor must send a "reasonable authenticated notification" before disposing of collateral after a default. This ensures debtors and other stakeholders have a chance to redeem their property.

The UCC Notice, however, does not provide the required specificity needed for a debtor or other secured party to exercise its right of redemption. For example, there is no dollar amount of any claimed indebtedness that may constitute a default under the LLC Agreement. The UCC Notice is otherwise vague and ambiguous as to the existence of any moentray orother specific default as of April 29, 2026. Moreover, there is speculation that any such indebtedness may have

11

already been paid form the rents prior to the April 29, 2006 notice being sent. The Debtor requires discovery to determine the existence of any indebtedness and the validity of the UCC Notice, especially given the failure of AVSRF to provide the Debtor with the April 2026 and subsequent management reports.

Notwithstanding the defectiveness of the UCC Notice, in order to preserve the Debtor's interests, the Debtor filed its Chapter 11 petition on May 22, 2026. Soon thereafter, on May 26, 2026 the Debtor filed an Adversary Proceeding (Adv. Pro. No. 26-01234; the "Adversary Proceeding") seeking declaratory relief under Section 365 and turnover under Section 542 with respect to Debtor's interests in the LLC Agreement and the parties' respective claims thereunder. The following day, on May 27, 2026, the Debtor removed the Delaware Proceeding from the State Court to the U.S. District Court, District of Delaware for transfer to this Court.

The Debtor will be seeking under its Plan to:

a) Cure the Debtor's monetary defaults, if any, under the LLC Agreement under 11 U.S.C. § 1123(A)(5)(G), which provides that a plan shall "provide adequate means for the plan's implementation, such as – (G) curing or waiving any default."

b) Assume the Debtor's interests under the LLC Agreement under 11 U.S.C. § 365(a) and cure any monetary defaults thereunder pursuant to 11 U.S.C. Section 365(b); and

c) Render ASVRF's secured claim, if any, unimpaired within the meaning of 11 U.S.C. § 1124;by paying such claim, if any, in full and  simultaneously having restored the Debtor as manager from pre-default conditions, tender and effectuate, on behalf of the LLC, to ASVRF the Redemption Payment for ASVRF's Class B interests.

**LEGAL ARGUMENT**

**POINT I**

**THE DEBTOR HAS THE RIGHTS UNDER THE BANKRUPTCY CODE TO ASSUME THE LLC AGREEMENT AND CONFIRM A PLAN**

In this Chapter 11 case, the tools of reorganization found in the Bankruptcy Code are readily apparent, the Debtor may assume the LLC Agreement pursuant to a Chapter 11 plan. Since a portion of the Debtor's interests in the LLC Agreement are assignable (see discussion below), the LLC Agreement is capable of assumption. Moreover, the Debtor is in the process  of raising the necessary funds to cure any prepetition defaults (to be determined after discovery and adjudication by the Bankruptcy Court), redeem AVSRF's Class B membership interests in the LLC and fund its 100% Plan. The Debtor expects to receive the funding necessary commitment prior to confirmation.

A. **11 U.S.C. § 1123(a)(5)(G) PRE-EMPTS DELAWARE LAW, ALLOWING THE DEBTOR TO CURE THE PREPETITION DEFAULTS AND ASSUME THE LLC AGREEMENT**

Section 1123(a)(5)(G) provides: "[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall…provide adequate means for the plan's implementation, such as – (G) curing or waiving any default." It is certain that the Third Circuit construes this provision as preempting state law. Specifically, the Third Circuit in <u>Federal–Mogul Global Inc.</u>, 684 F.3d 355 (3d Cir. 2012), stated:

> The fifteenth edition of Collier, which came out after the 1978 Code, broke with prior editions' admonition that a plan's terms may be required to conform to state law, and stated instead that under § 1123, "a plan may propose such actions notwithstanding nonbankruptcy law or agreements." *In re Kizzac Mgmt. Corp.,* 44 B.R. 496, 504 (Bankr.S.D.N.Y.1984) (quoting 5 *Collier on Bankruptcy* ¶ 1123.01[5] at 1123–10 (15th ed. 1979)). Case law from the period between 1978 and 1984 generally, although not unanimously, held that § 1123 preempted state law. *See In re Taddeo,* 685 F.2d 24, 29 (2d Cir.1982) (holding that, since § 1123(a)(5)(G) provides the authority to cure a default in a Chapter 11 proceeding, "[a] state law to the

contrary must fall before the Bankruptcy Code"); *Valente v. Sav. Bank of Rockville,* 34 B.R. 362, 365–67 & n. 3 (D.Conn.1983) (concluding that § 1123(a)(5)(G) allows for the curing of defaults notwithstanding state court judgments under the Supremacy Clause); *In re Kizzac Mgmt. Corp.,* 44 B.R. at 504 (holding that § 1123(a)(5)(E) grants the bankruptcy court the power to compel an assignment rather than a satisfaction of a mortgage).

In re Federal–Mogul., Inc, 684 F.3d 355, 376–77 (3d Cir. 2012).

 The Federal-Mogul, Court stated further:

We also find relevant § 1123(d), which provides: 'Notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.' The reference to subsection (a) indicates that, absent this provision, § 1123 would operate to preempt nonbankruptcy law governing the curing of defaults. The only reference to curing a default in § 1123 appears at § 1123(a)(5)(G), in the list of transactions that could constitute 'adequate means.' We find this strong evidence that Congress interpreted § 1123(a) to reach the ten transactions listed under § 1123(a)(5).

In re Federal–Mogul Inc., Id., at 370 (3d Cir. 2012).

Similarly, in In re W.R. Grace & Co., 475 B.R. 34, 198 (D. Del. 2012), the

Delaware District Court held that:

After a careful and thorough review of the relevant statutory text, case law, and legislative history, the Third Circuit held that the Bankruptcy Code expressly preempted state law in this context, unequivocally stating that: "[t]he plain language of § 1123(a) evinces Congress's clear intent to preempt state law." *Id.* at 369. The court rooted its finding in the statutory phrase "[n]otwithstanding any otherwise applicable nonbankruptcy law," which it believed "'clearly signal[ed] the drafter's intention that the provisions of the "notwithstanding" section override conflicting provisions.'" *Id.* at 369 (quoting *Cisneros v. Alpine Ridge Grp.,* 508 U.S. 10, 16, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993)) (further citation omitted). The Third Circuit further noted that its holding advanced the overall purpose of the Bankruptcy Code, most notably the goals of obtaining a 'fresh start' through bankruptcy reorganization and harmonizing the interests of debtors and creditors alike. *Id.* at 378.

In re W.R. Grace & Co., 475 B.R. 34, 198 (D. Del. 2012), aff'd sub nom. In re WR Grace & Co.,

14

729 F.3d 332 (3d Cir. 2013), and aff'd, 532 F. App'x 264 (3d Cir. 2013), and aff'd sub nom. In re

WR Grace & Co., 729 F.3d 332 (3d Cir. 2013), and aff'd, 729 F.3d 311 (3d Cir. 2013). Because

the State Court decision was based on Delaware law, its holding that the Debtor's management

rights were preliminarily[3] terminated is thus preempted by section 1123(a), as the Debtor may cure

the pre-petition monetary defaults that specifically resulted in the termination.

B.   **THE DEBTOR IS PERMITTED TO ASSUME THE LLC AGREEMENT**

The LLC Agreement is an executory contract capable of assumption under Section 365, as,

inter alia, the Debtor's interests in the LLC agreement are assignable.

Section 11.1 of the LLC Agreement provides, in pertinent part, as follows:

11.1 Dispositions of Membership Interests.

(a) General Restriction. The Manager (other than a Class B Member
Appointed Manager) and each Member may not Transfer all or any portion
of its rights and obligations under this Agreement or its Membership
Interest (including a Transfer of an Economic Interest), except with the
prior written consent of the other Members, which consent may be given
or withheld in each Member's sole and absolute discretion, or as permitted
in Sections 11.1(b) or11.1(c) ("**Permitted Transfers**"). To the fullest
extent permitted by law, any attempted Transfer of any rights and
obligations under this Agreement or of all or any portion of a Membership
Interest, other than in strict accordance with this Article 11, shall be void.
For purposes of this Agreement, a Transfer shall include any Change of
Control of the Class A Member, including the Manager (unless the
Manager is a Class B Member Appointed Manager), and shall specifically
not apply to any Change of Control of the Class B Member.

(b) Permitted Transfers by the Class B Member. Notwithstanding
Section 11.1(a), the Class B Member may Transfer all or any portion of its
Membership Interest(i) to any Affiliate of the Class B Member, or (ii) to
any Person so long as the Class B Member retains management authority,
whether directly or indirectly, over the Person owning such membership
Interest, and, at the election of the Class B Member upon any such
Transfer, that transferee shall be admitted as a substitute Member;

---

[3] The Delaware Chancery Court's decision only granted AVSRF a *preliminary*, and not permanent, injunction as to the termination of the Debtor's management rights. Movant's argument that a preliminary injunction is "law of the case" is incorrect as a matter of law. See *Transcon. Gas Pipe Line Co., LLC v. Penn. Env't Hearing Bd.*, 108 F. 4th 144, 150 (3d Cir. 2024)

15

provided, however, that no such Transfer causing a default under the Third Party Loan Documents shall be permitted.

(c) <u>Transfers by Class A Member.</u> Notwithstanding Section 11.1(a), but subject to Section 11.1(d) below, direct and indirect Transfers of interests in the Class A Member and the Manager (other than a Class B Member Appointed Manager) shall be permitted without the prior written consent of the Class B Member provided that (i) any such direct or indirect Transfer shall not (A) exceed twenty percent (20%) of the direct or indirect interests in the Class A Member or the Manager, in the aggregate for all such Transfers; or (B) result in a Change of Control of the Class A Member or the Manager, (ii) such Transfer combined with any previous Transfer will not subject the Company to a reassessment of any taxes on the Property or any sales tax, real estate excise tax, or transfer tax assessed by any Governmental Authority unless any such sales tax, real estate excise tax or transfer tax is fully paid by the Class A Member, (iii) the Class A Member provides prompt written notice of such Transfer to the Class B Member, together with all supporting information and documentation required by the Class B Member in connection with such Transfer, (iv) the Class A Member pays any and all of the Company's and the Class B Member's costs in connection with any such Transfer, (v) no additional Membership Interests are created by such Transfer (*i.e.*, there shall continue to be not more than one (1) Class A Member), and (vii) no such Transfer shall relieve the Class A Member or any Indemnitor of its obligations under this Agreement or the other Transaction Documents.

Under Third Circuit and Delaware bankruptcy law, the proposition that a contract assignable by its terms must also be assumable is substantially correct but not absolute. Courts in this jurisdiction have held that if a contract is assignable under applicable non-bankruptcy law — including by virtue of express contractual language permitting assignment — then it is also assumable by a debtor in possession in bankruptcy. This flows directly from the Third Circuit's adoption of the "hypothetical test" under 11 U.S.C. § 365(c)(1): assumability depends on whether the contract could hypothetically be assigned to a third party. If the answer is yes, the contract is assumable. However, the converse is equally true: if applicable non-bankruptcy law prohibits assignment — regardless of what the contract says — the contract cannot be assumed without the non-debtor's consent. The key limiting principle is that contractual assignability provisions can satisfy the hypothetical test and thereby render a contract assumable, but only where, as in the

16

Debtor's case, no overriding non-bankruptcy law independently bars assignment.

In In re Physiotherapy Holdings, Inc., 538 B.R. 225 (2015), the United States District Court for the District of Delaware directly held: "Because the License Agreement is assignable under 11 U.S.C. § 365(c), the Third Circuit's 'hypothetical test' dictates that it is also assumable." *Id.* at 234. In that case, the license agreement contained express provisions allowing the debtor to assign the agreement to a surviving entity without the licensor's consent, provided the licensor had not exercised its right to terminate upon a change of status. Because the licensor failed to timely exercise that termination right, the agreement became assignable without consent — and therefore assumable. *Id.* at 230-34. The court also confirmed the important principle that a non-debtor party can contractually waive its right to later withhold consent to assignment, and such a waiver directly affects the assumability analysis. *Id.*

The Bankruptcy Court for the Western District of Pennsylvania reached the same conclusion in In re MeSearch Media Technologies, Limited, 668 B.R. 828, 828 (2025), decided in 2025. There, a patent license agreement contained a provision stating it could be assigned to a "successor in interest" without the licensor's further consent. *Id.* The court held that this language satisfied the Third Circuit's hypothetical test, overriding federal patent law's general prohibition against assignment of patent licenses. The court stated unequivocally: "if the License can be assigned, it can be assumed". *Id.* at 839. The court rejected the Fourth Circuit's contrary approach in In re Sunterra Corp., which had held that assumption and assignment are distinct concepts requiring separate contractual consent. *Id.* The *MeSearch* court found *Sunterra* inconsistent with the plain language of § 365(c), reasoning that § 365(c)(1)(A) focuses on whether the agreement may be assigned, and if it may, the inquiry ends there — no separate consent to assumption is required. *Id.* This ruling was affirmed by the United States District Court for the Western District of Pennsylvania in Crivella Holdings Ltd. v. Mesearch Media Techs., Ltd., No. 2:25-CV-333, 2025

WL 2443400, at *6 (W.D. Pa. Aug. 25, 2025), which agreed that § 365(c) does not require language consenting to assumption separate from assignment.

Thus, if the contract expressly permits assignment to successors in interest, as is permitted under Section 11.1(c) of the LLC Agreement, surviving entities, or other third parties, this language will generally satisfy the hypothetical test and render the contract assumable, even if the debtor does not intend to actually assign it. Under the Plan, the Debtor shall assume the LLC Agreement through cure and reinstatement under Sections 365(b) and 1123(a)(5)(G) of the Bankruptcy Code.

Moreover, the Bankruptcy Code preempts Section 18-304 under the Delaware Limited Liability Company Act, i.e., a debtor ceases to be a member upon fling of a bankruptcy and preserves the Debtor's interests in the LLC and therefore the LLC Agreement under Sections 365 and 1123. As for additional authority for the Debtor's right to assume the LLC Agreement, there is little question that, in general, limited liability company operating agreements, such as the one at issue here, are executory contracts capable of being assumed. See, e.g., In re Allentown Ambassadors, Inc., 361 B.R. 422, 444 (Bankr. E.D. Pa. 2007) ("LLC operating agreements should be considered executory contracts due to members' 'management, voting, financial and other duties'"); In re IT Grp., Inc., Co., 302 B.R. 483, 487 (D. Del. 2003) ("By its appeal, Northrop contends that the Bankruptcy Court erred in concluding that the default provision was not enforceable, thereby precluding Northrop from exercising its buy-out rights under the Operating Agreement. Reviewing this clause in light of the applicable law, the Court concludes that the Bankruptcy Court correctly concluded that the default provision is an *ipso facto* clause which is unenforceable under Section 365(e)(1) of the Bankruptcy Code."). Any attempt to prevent the Debtor from exercising its membership interest or assuming the limited liability contract is subject to the automatic stay and 11 U.S.C. § 365. See, e.g., In re Envision Healthcare Corp., 655 B.R.

18

701, 711 (Bankr. S.D. Tex. 2023) ("In any case, this Court need not opine on whether 'ceases to be a member' under Section 18-304 means keeping economic, but not other rights. It doesn't change the fact that Section 18-304 directly conflicts with § 541(a)(1). Or that it is a state law that ceases, modifies, and amends an LLC member's rights only because it filed for bankruptcy, which means it directly conflicts with § 541(c)(1)(B). Nothing in the Bankruptcy Code renders the economic versus managerial distinction meaningful in the context of the creation of the [bankrupt] estate. Any such legal or equitable interest at the time of filing comes into the estate."); Levine v. B & R Acquisition Partners, LLC, 674 B.R. 838, 847–48 (N.D.N.Y. 2025) ("In Envision, the court held 'Section 18-304 of the [Delaware] Act directly conflicts with, and must give way to, § 541 of the Bankruptcy Code.' Envision, 655 B.R. at 712. Appellants rely on the Envision case to support its argument that § 541 preempts the Delaware laws at issue. *See* Dkt. No. 34 at 17. Appellants are correct that a bankruptcy court in the Southern District of Texas "clarified 'that a member of a Delaware LLC who starts a bankruptcy case keeps all legal and equitable interests in the LLC that it held as of the commencement of the case.'" Id. (quoting *Envision*, 655 B.R. at 711).").

Moreover, the Debtor's economic interest is specifically preserved under the LLC Agreement in the event of bankruptcy. Section 6.14 of the LLC Agreement provides, in relevant part:

> 6.14 Bankruptcy Event. The Members expressly agree that upon the occurrence of a Bankruptcy Event in respect of a Member (the "Bankrupt Member"), such Bankrupt Member shall not forfeit its Economic Interest but shall automatically, without any notice, lose any management, voting or consent rights including any voting or consent rights held by it as a Member and, if the Bankrupt Member is then the Manager, any management, voting or consent rights held by it as the Manager and the non-Bankrupt Member shall automatically become the Manager and shall assume all of the rights and obligations of the Manager from and after the date of the occurrence of such Bankruptcy Event. The Members further expressly agree that upon the occurrence of a Bankruptcy Event in respect of the Manager, if the Manager is not a Member, the Manager shall automatically, without any notice, lose any management, voting or consent rights including any voting or consent

19

rights held by it as the Manager, and the Class B Member (or a Class B Member Appointed Manager) shall automatically become the Manager and shall assume all of the rights and obligations of the Manager in its capacity as Manager from and after the date of the occurrence of such Bankruptcy Event.

In the Motion, Movants implicitly argue that other than Economic Interests,[4] the Debtor's rights under the LLC Agreement are cancelled. Such an effect would violate the prohibition on *ipso facto* clauses. See 11 U.S.C. § 365(f), which provides:

(f) (1) Except as provided in subsections (b) and (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.
(2) The trustee may assign an executory contract or unexpired lease of the debtor only if—
(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.
(3) Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee.

Movants will no doubt argue that state law, specifically the applicability of 6 Del. Code § 18-304 and 11 U.S.C. § 365(c)(1) create a different result. This is not the case, however, as section 365(c)(1) of the Bankruptcy Code provides:

(c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—

(1) (A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering

---

[4]   Which ASVRF sought to cancel through a UCC sale scheduled for July 16, 2026. A copy of the notice scheduling the UCC Sale is annexed to the Greer Declaration as Exhibit "B"

performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

(B) such party does not consent to such assumption or assignment;

Movants will also likely make this argument not because it fears having its interests intertwined with a Chapter 11 debtor, but to excuse it from, and reneging on, accepting its already agreed upon redemption of its Class B interests. In addition, Movants will no doubt argue, in accordance with the State Court's Memorandum Opinion of November 21, 2025 (the "Memorandum Opinion"), that it was entitled not to accept the Debtor's tender of redemption since it was previously ousted as manager. The State Court stated relevant part in the Memorandum Opinion:

> On May 8, 2025, The Debtor purported to provide ASVRF notice that the Company was redeeming ASVRF's Class B membership interests (the "Redemption Notice"). The Debtor signed the Redemption Notice as the Company's "Manager" and attached a form of redemption agreement also signed by it as "Manager."
>
> The next day, ASVRF rejected the Redemption Notice, reminding The Debtor that it was no longer the Manager.

This may be true in the absence of a Chapter 11 proceeding. However, the Debtor's rights must be evaluated in light of the pending reorganization proceeding, and the Bankruptcy Code specifically permits the Debtor to assume the LLC Agreement.

In addition, the Debtor retains the right to redeem not withstanding a default under the LLC. See LLC Agreement, Section 7.3 which states:

> 7.3 Post-Default Redemption Right. Following the expiration of the Default Redemption Period without a Redemption of the Class B Member's Membership Interest in accordance with this Agreement, the Manager or the Class A Member (if the Manager has been removed pursuant to Section 7.2(a)(ii)) **shall have a continuing right** to cause the Company to Redeem the Membership Interest of the Class B Member in accordance with this Agreement.

21

(emphasis added).

In light of the Chapter 11 filing, this Court can and should find that the Debtor, under its recently filed Plan of Reorganization (ECF Docket No. 29)(the "Plan", Exhibit "D" to Greer Declaration), under 11 U.S.C. § 1123(a)(5)(G) that the clock is rewound and the Debtor restored to its pre-default position as manager of the Company. The State Court indeed found that "…ASVRF was—and is—willing to be redeemed…." Section 12.5 of the LLC Agreement provides:

> Class B Member's Membership Interest under Article 12 and Section 7.3 (or distributions under Section 5.3 sufficient to satisfy all requirements necessary for the Class B Member to reconvey its entire Membership Interest to the Company and resign as a Member) shall be consummated at the offices of the Company (i) on a mutually acceptable date before the last day for closing specified by the applicable provision of this Article 12, where the last day is specified, or (ii) in all other cases, at another mutually convenient day agreed upon in writing by the Class B Member and the Manager (hereinafter referred to as the "Redemption Closing"). At the Redemption Closing, (a) the Company will cause all of the following to occur (collectively, the "Redemption Conditions") (i) distribute or pay to Class B Member an amount equal to the amounts distributable or payable to Class B Member pursuant to Section 5.3 and (ii) if Replacement Guaranties have been provided, distribute or pay to the Replacement Guarantors (A) the amounts distributable or payable to the Replacement Guarantors pursuant to Section 5.3, and (B) deliver releases of any outstanding Replacement Guaranties (which releases shall be in form and content satisfactory to the Replacement Guarantors in their sole and absolute discretion), and (b) the Members and the Company (i) shall execute and deliver the Redemption Agreement, (ii) the Class B Member shall return to the Company, duly endorsed to the Company the Class B Member's Membership Certificate, and (iii) if requested, the Class B Member shall execute an amendment to this Agreement, reflecting that the Class B Member has ceased to be a Member of the Company, and (c) the Company will change its books and records to reflect the Redemption of such Membership Interest in the Company.

Under the Plan, the Debtor, upon (1) assumption of the LLC Agreement and (2)

22

reinstatement as Manager, will exercise the Company's redemption rights,[5] Indeed, ASVRF's real agenda is not its disdain for the Debtor; rather it is the prospect of a windfall in terms of enhanced property value in the underlying investment that it seeks to the direct detriment and harm to the Debtor and its other creditors. The Debtor believes that AVSRF may have already concocted a scheme to sell out the Debtor through wrongful termination or cram down or dilute the Debtor's interests via shareholder oppression and/or disenfranchisement for its own pecuniary gain and windfall. Further discovery of ASVRF is required to further investigate these potential fiduciary breaches.

As is true of 11 U.S.C. § 1123(a)(5)(G) concerning preemption with respect to cure waiver under a plan, 11 U.S.C. § 365(a) and (e) are preemptive as well. See, e.g., In re Trib. Co. Fraudulent Conv. Litig., 946 F.3d 66, 82 (2d Cir. 2019) ("To understate the proposition, the regulation of creditors' rights has 'a history of significant federal presence.' United States v. Locke, 529 U.S. 89, 90, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000). Congress's power to enact bankruptcy laws was made explicit in the Constitution as originally enacted, Art. 1, § 8, cl. 4, and detailed, preemptive federal regulation of creditors' rights has, therefore, existed for over two centuries."). 11 U.S.C. § 365(a) and the right to cure default under 11 U.S.C. § 365(b) are *in pari materia* with 11 U.S.C. § 1123(a)(5)(G) in that they cover the same subject area and have the same rehabilitative purpose.

---

[5] The Debtor will, subject to Court approval, utilize BAK Advisors, whose principal is Bernard Katz, in the event that there is any but a momentary interval between the Debtor's restoration to management and the Redemption Closing.

**POINT II**

**THIS CHAPTER 11 PROCEEDING WAS FILED IN GOOD FAITH AND THE DEBTOR INTENDS TO PROMPTLY CONFIRM A PLAN**

A. **THE DEBTOR'S CHAPTER 11 FILING IS NOT OBJECTIVELY OR SUBJECTIVELY FUTILE**

The Court, in In re PPI Enters. (U.S.), Inc., 324 F.3d 197, 211 (3d Cir. 2003) discussed extensively the requirement of good faith in filing a Chapter 11 petition. The Court found that the attempt by a debtor to avail itself of certain bankruptcy code provisions did not constitute bad faither. The PPI Court stated:

> The Bankruptcy Court determined it was not necessarily "bad faith" for debtors to file for bankruptcy to avail themselves of certain Code provisions. *PPI Enters.,* 228 B.R. at 345 ("[I]n evaluating a debtor's good faith, the court's only inquiry is to determine whether the debtor seeks to abuse the bankruptcy law by employing it for a purpose for which it was not intended."); *see, e.g., In re W & L Assocs., Inc.,* 71 B.R. 962, 967–68 (Bankr.E.D.Pa.1987) (§ 365); *In re Bofill,* 25 B.R. 550, 552 (Bankr.E.D.N.Y.1982) (rejection of contract). The Bankruptcy Court found "the primary purpose of the petition was to cap Solow's claim pursuant to § 502(b)(6)." *PPI Enters.,* 228 B.R. at 343. "Because PPI[E]'s intention to cap Solow's claim using § 502(b)(6) [was] not a use of the Code for a purpose for which it was not intended – indeed, PPI[E][was] using § 502(b)(6) for exactly its intended purpose – ... PPI[E]'s filing does not violate the good faith filing doctrine." *Id.* at 345 (internal quotations omitted).[23]

In re PPI Enters. (U.S.), Inc., 324 F.3d 197, 211 (3d Cir. 2003).

An early seminal case on bad faith dismissal of Chapter 11 proceedings is Carolin Corp. v. Miller, 886 F.2d 693, 700, 701 (4th Cir. 1989) ("This suggests that something more than even the most obvious likelihood of ultimate futility should be required to justify threshold dismissals for want of good faith in filing. The something more, as generally recognized, is subjective bad faith on the part of the petitioner….. By the same token, even if subjective bad faith in filing could properly be found, dismissal is not warranted if futility cannot also be found."). This Plan, to be

24

confirmed, does not rely upon unobtainable creditor consensus or unobtainable funds. All creditors are unimpaired, and the Debtor's principal has raised the necessary funds.

The Carolin court, discussing objective and subjective futility, stated further:

The objective futility inquiry is designed to insure that there is embodied in the petition "some relation to the statutory objective of resuscitating a financially troubled [debtor]." *In re Coastal Cable TV, Inc.,* 709 F.2d 762, 765 (1st Cir.1983). It should therefore concentrate on assessing whether "there is no going concern to preserve ... and ... no hope of rehabilitation, except according to the debtor's 'terminal euphoria.' " *Little Creek,* 779 F.2d at 1073.

The subjective bad faith inquiry is designed to insure that the petitioner actually intends "to use the provisions of Chapter 11 ... to reorganize or rehabilitate an existing enterprise, or to preserve going concern values of a viable or existing business." *In re Victory Constr. Co.,* 9 B.R. 549, 564 (Bankr.C.D.Cal.1981) (Victory I ). Put obversely, its aim is to determine whether the petitioner's real motivation is "to abuse the reorganization process" and "to cause hardship or to delay creditors by resort to the Chapter 11 device merely for the purpose of invoking the automatic stay, without an intent or ability to reorganize his financial activities." *In re Thirtieth Place, Inc.,* 30 B.R. 503, 505 (9th Cir.Bankr.App.1983).

Carolin Corp. v. Miller, 886 F.2d 693, 701–02 (4th Cir. 1989).

The Debtor should be permitted to reorganize. It has filed a confirmable Plan which will pay all of its creditors in full and maximize the value of its bankrupt estate. To the contrary, ASVRF has no equitable or statutory right to a windfall.  The balance of harms clearly lies in favor of the Debtor's right to reorganize.

**B. THERE ARE UNSECURED CREDITORS THAT ABSENT A PLAN WILL NOT BE PAID**

As set forth in the Debtor's schedules, ASVRF has a disputed secured claim in the amount of $2,134,133.88. Exclusive of insiders, the Debtor has unsecured creditors in the minimum amount of approximately $1,400,000.00. This is not a single creditor-single Debtor dispute.

Movant seeks to dismiss this Chapter 11 case pursuant to Section 1112(b)(1) of the Bankruptcy Code, which provides in pertinent part that:

> [O]n request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1).

See, e.g., In re LTL Mgmt., LLC, 652 B.R. 433, 443 (Bankr. D.N.J. 2023), aff'd sub nom. In re LTL Mgmt. LLC, No. 23-2971, 2024 WL 3540467 (3d Cir. July 25, 2024) ("[A] Chapter 11 petition is subject to dismissal for 'cause' under 11 U.S.C. § 1112(b) unless it is filed in good faith." *In re SGL Carbon Corp.*, 200 F.3d 154, 162 (3d Cir. 1999). "

Section 1112(b)(4) then sets forth a non-exclusive list of grounds that constitute "cause" under subsection 1112(b)(1). See, e.g., In re 3 Ram, Inc., 343 B.R. 113, 118 (Bankr. E.D. Pa. 2006) ("If the Chapter 11 case cannot achieve a reorganization within the statutory requirements of the Code, then there is no point in expending estate assets on administrative expenses or delaying creditors in the exercise of their nonbankruptcy law rights.")

In In re Walden Ridge Dev., LLC, 292 B.R. 58, 62 (Bankr. D.N.J. 2003), a case cited by ASVRF, the Court denied a party's motion to dismiss stating "(s)ignificantly, dismissals of Chapter 11 cases caused by a debtor's bad faith routinely show elements of prejudice to one or more creditor classes." In this case, ASVRF will receive its redemption payment as well as 100% payment of its prepetition claim. **What it will not receive is its projected windfall.** The Walden Ridge court found facts similar to the case at bar, that "(i)n addition, the Court finds that the Debtor operates a legitimate business, the business of acquiring and developing a specific parcel of real property." In re Walden Ridge Dev., LLC, 292 B.R. 58, 63–64 (Bankr. D.N.J. 2003). In Vascular Access Centers, L.P., 611 B.R. 742, 761 (Bankr. E.D. Pa. 2020) the Court also did not dismiss the case; it appointed a trustee pursuant to 11 U.S.C. § 1104 "(b)ased upon McGuckin's inability to discharge his fiduciary responsibilities to VAC and his conflicts of interest with VAC." In re

26

Vascular Access Centers, L.P., 611 B.R. 742, 765 (Bankr. E.D. Pa. 2020)" (cleaned up). Similarly, in In re SGL Carbon Corp., 200 F.3d 154, 165 (3d Cir. 1999), the Court stated in reversing a lower court and directing dismissal of a Chapter 11 case, stating: "(S)several cases hold that a Chapter 11 petition is not filed in good faith unless it serves a valid reorganizational purpose." In In re 15375 Mem'l Corp. v. Bepco, L.P., 589 F.3d 605, 619 (3d Cir. 2009) the Court stated that (a) party filing for Chapter 11 bankruptcy may prove that its petition served a valid bankruptcy purpose by showing that the petition "preserv[ed] a going concern or maximiz[ed] the value of the debtor's estate [.]" The avoidance of a windfall to one party and the restoration of management and the Redemption Closing "maximizes the value of the debtor's estate." The remaining cases on this issue cited by ASVRF similarly grant the Court discretion to dismiss a case. In this instance, the Debtor can immediately fund a plan. ASVRF does not wish this result since it loses its hoped for windfall and forfeiture of the Debtor's interests. Brass-knuckle tactics do not equal rights in any equitable context.

Further, the case of In re Miloszar, 238 B.R. 266 (D.N.J. 1999) stands for the unremarkable proposition that a state court judgment is entitled to full faith and credit. In this case, the Debtor acknowledges the Memorandum Opinion and seeks to utilize bankruptcy code provisions not to relitigated the limited issue decided by the State Court but instead to "wind back" the monetary default identified in the Memorandum Opinion and treat all parties in the matter to which they are legally entitled. As set forth above, this case is not a two-party dispute, and the Debtor has the statutory tools and means to promptly confirm a plan.

In this case, the Debtor has filed a confirmable Plan and as discussed above, can and will, subject to Court approval, confirm a Plan utilizing 11 U.S.C. §§ 1123(a)(5)(G) and 365(a) and complying with 11 U.S.C. § 1129(a).

**POINT III**

**MOVANTS HAVE NOT DEMONSTRATED CAUSE TO
LIFT THE AUTOMATIC STAY**

Movants have not established cause, as required, to lift the automatic stay. Movants rely

upon 11 U.S.C. § 362(d)(1) in order to proceed in the State Court. 11 U.S.C. § 362(d)(1) provides:

> (d) On request of a party in interest and after notice and a hearing, the court
> shall grant relief from the stay provided under subsection (a) of this section,
> such as by terminating, annulling, modifying, or conditioning such stay—
> (1) for cause, including the lack of adequate protection of an interest in
> property of such party in interest;

In In re Mireskandari, No. 18-32759-JKS, 2019 WL 2011102, at *2 (Bankr. D.N.J. May 6,

2019) the Court laid out the factors necessary for court consideration of such a motion.

> To determine whether it is necessary to allow prosecution to
> continue in another forum, courts consider whether: **(1) relief would
> result in a partial or complete resolution of issues; (2) there is a
> connection with or interference with the bankruptcy case;** (3)
> the other proceeding involves the debtor as a fiduciary; **(4) a
> specialized tribunal with the necessary expertise has been
> established to hear the cause of action;** (5) the debtor's insurer has
> assumed full responsibility for defending it; (6) the action primarily
> involves third parties; **(7) litigation in another forum would
> prejudice the interest of creditors;** (8) the judgment claim arising
> from the other action is subject to equitable subordination; (9) the
> moving party's success in the other proceeding would result in a
> judicial lien avoidable by the debtor; (10) stay relief would further
> the interests of judicial economy and lead to an expeditious and
> economical resolution of litigation; (11) the parties are ready for trial
> in the other proceeding; and **(12) imposition or relief from the stay
> will cause significant harm to either of the parties.**

In re Mireskandari, No. 18-32759-JKS, 2019 WL 2011102, at *2 (Bankr. D.N.J. May 6, 2019).

Factors (1), (2), (4), (7) and (12) are relevant to this matter. **Factors (1) and (2)** weighs

against lifting of the automatic stay because the State Court will not adjudicate the Debtor's rights

to cure or waive default under 11 U.S.C. § 1123(a)(5)(G). The State Court adjudication of the

Debtor's rights under the Bankruptcy Code will interfere with the bankruptcy case. **Factor (4)**

weighs in favor of lifting the stay since the State Court (the Delaware Chancery Court), has acknowledged expertise in adjudicating business disputes. **Factor (7)** weighs against lifting the automatic stay, inasmuch as if the rights of the Class A interest holder, the Debtor are extinguished there will be no recovery. **Factor (12)** weighs against lifting the stay. The failure to lift the stay will cause ASVRF no harm since they will receive their allowed preferred return for their prepetition claim. Upon the Redemption Closing, ASVRF will receive the amount for redemption of their interests to which they are entitled under the LLC Agreement. Thus, of the relevant factors, four weigh against lifting the stay and one militates in favor. Factor 12 is entitled to the greatest consideration, in that the balance of harms tips heavily against ASVRF. Under reorganization ASVRF gets its entitlement, but not a windfall.

In addition, ASVRF did not provide an appraisal as required by Local Rules for the Bankruptcy Court, 4001(a)(2)(G). This rule states:

> (2) The movant must file a certification that includes the following exhibits,
> as applicable:
> (A) note;
> (B) bond;
> (C) mortgage bearing the stamped date of recordation;
> (D) security agreement;
> (E) financing statement bearing the stamped date of filing;
> (F) assignment; and
> **(G) appraisal**

One can only speculate that a reason for not providing an appraisal was to avoid showing the Court the extent of the windfall which ASVRF seeks. Failure to follow express rules of the Court should not be permitted, especially when such failure benefits the party that has failed to comply with such rule and stands to benefit from such failure.

Moreover, although not contested by Movants, the Debtor has a significant equity cushion in its Class A Member interests in the LLC subject to AVSRF's security interest which formed the basis for AVSRF's attempt to foreclose on the Debtor's interests.

29

As demonstrated in the offering memorandum attached to the Greer Declaration (Exhibit "C"), the Debtor asserts an equity cushion with respect to its member interests in the LLC in the approximate amount of $64,000,000. As of the Petition Date, ASVRF's secured claim was approximately $2,134,133.88. Therefore, AVSRF is more than adequately protected pending confirmation of the Plan.

Under the Bankruptcy Code and as interpreted by the Third Circuit and Delaware courts, a debtor's equity cushion - the value of collateral exceeding the secured creditor's claim and all senior liens - can, in appropriate circumstances, constitute adequate protection of a secured creditor's interest under 11 U.S.C. § 361. However, whether an equity cushion alone satisfies adequate protection for future performance obligations is a fact-intensive inquiry. Courts in the Third Circuit and the District of Delaware apply a multi-factor analysis that looks beyond the static size of the cushion to assess whether it will remain meaningful throughout the period of future performance. A substantial, non-eroding equity cushion may suffice; a slim or rapidly eroding cushion will not. Even a large cushion may be inadequate when the debtor's proposed future operations are likely to rapidly deteriorate the collateral. See In re Zimmerman, 31 B.R. 122 (Bankr. M.D. Pa. 1983) (The court denied a creditor's complaint to lift the automatic stay, holding that the equity cushion alone was sufficient to provide adequate protection. The court found merit in the debtor's contention that the equity cushion constituted adequate protection without more); In re GVM, Inc., 605 B.R. 315 (Bankr. M.D. Pa. 2019) (The court granted the debtors' motion to use cash collateral, finding that equity cushions that entirely offset the identified risks to the secured creditor's interest were sufficient to provide adequate protection, with replacement liens and periodic payments removing any remaining doubt); In re Heath, 79 B.R. 616 (Bankr. E.D. Pa. 1987) (Despite the debtor's failure to make any postpetition mortgage payments, the court held that a 39% equity cushion in mortgaged property provided adequate protection, precluding relief

from the stay. The court refused to engage in a mechanistic comparison of cushion percentages and instead looked at the larger picture, including the rate of erosion and the debtor's reorganization prospects); In re Sharon Steel Corp., 159 B.R. 165 (Bankr. W.D. Pa. 1993) (The court acknowledged as a general rule that the existence of an equity cushion alone can constitute adequate protection for a debtor's use of cash collateral, though it found the cushion insufficient on the specific facts of that case); but see, In re Liona Corp., *N.V.*, 68 B.R. 761 (Bankr. E.D. Pa. 1987) (The court held that an equity cushion of $1,800,000 (8.9% of collateral value) did not provide adequate protection for third mortgagees seeking relief from the stay. The court applied a multi-factor analysis and found the cushion too slim, particularly given the rate of erosion).

In the Debtor's case, an approximate $64 million, non-eroding equity cushion satisfies the Sharon Steel analysis and permits this Court to find that AVSRF is more then adequately protected for purposes of Section 362(d).

For this additional reason, cause does not exist for lifting of the automatic stay, which would result in a harsh and inequitable forfeiture of the Debtor's assets and concomitant windfall to AVSRF to the complete detriment and harm to the Debtor and its other creditors.

## POINT IV

### DEBTOR REQUIRES DISCOVERY TO DETERMINE (1) AMOUNT OF CURE, IF ANY AND (2) AMOUNT REQUIRED FOR EXERCISE OF REDEMPTION RIGHTS

AVSRF continues to refuse or ignore the Debtors requests to provide the Debtor with (a) actual amount of any outstanding indebtedness and (2) the amounts necessary for the LLC to redeem AVSRF's Class B membership interests upon the Debtor's assumption and cure, if any, of the LLC Agreement.

The Debtor is in the process of serving Rule 30 subpoenas on, inter alia, ASVRF and Greystone to obtain updated financial statements  including amounts allegedly due for

31

outstanding indebtedness under the LLC Agreement and an accounting and calculation of the amounts needed to redeem ASVRF's Class B membership interests in the LLC.

At a minimum, absent denial of the Motion, this discovery must be completed before the Court can consider the merits, if any, of the Motion or confirmation of the Debtor's Plan, which process should proceed simultaneously with any discovery or litigation ongoing between the parties.

## **CONCLUSION**

For the foregoing reasons, the Debtor respectfully requests that the Court deny the Motion in its entirety and/or grant such other and further relief as the Court deems just and proper.

Dated: June 30, 2026
White Plains, New York

Respectfully,

DAVIDOFF HUTCHER & CITRON LLP
*Attorneys for the Debtor*
120 Bloomingdale Road, Suite 100
White Plains, New York 10605
(914) 381-7400

By: */s/ Robert L. Rattet*
Robert L. Rattet, Esq. (Admitted Pro Hac Vice)
Andreas Koutsedakis, Esq. (Admitted in New Jersey)